**SOMMERS v. COMMISSIONER OF INTERNAL REVENUE.**

No. 69, Docket 21774.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1951.

Decided Jan. 8, 1952.

Nordlinger, Riegelman & Benetar, New York City, for petitioner; H. H. Nordlinger and Simon J. Hauser, New York City, of counsel.

Charles Oliphant, Washington, D. C., Theron L. Caudle, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson and Louise Foster, Sp. Assts. to Atty. Gen., for respondent.

Before SWAN, Chief Judge, and L. HAND and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Sommers, the taxpayer, seeks to reverse an order of the Tax Court which assessed a deficiency in his income tax for the year, 1944. The Commissioner included in his income the whole of Sommers' distributive share of the profits of a firm, called Deauville Bags, of which he was one of three partners; and Sommers asserts that it was improper to include more than one half the share, because the other half was the income of his wife. The judge held that he had not proved that his wife had become entitled to one half the share and affirmed the deficiency. Since the appeal depends upon this question alone, and since that in turn depends upon what, if any, agreement the spouses had made, a statement of the evidence in a little detail is necessary. In 1932 Sommers, who up till then had for many years been engaged in the business of making handbags, had just been through bankruptcy and was without resources; but his wife had money of her own and was willing to give him a new start in business. A small corporation, known as Deauville Bags, Inc., was then owned by two or three shareholders, among whom were Fein and Williams; it had been making handbags for about a year; and, although it had not been successful, Mrs. Sommers acquired enough of its shares to equal the holdings of Fein and Williams, and those of a third person, one Oppenheimer. It was agreed that for a year Sommers should become president and that he and Fein and Williams should each receive a salary of $30 a week; and this agreement was continued from year to year until 1943. The business was operated at a loss until 1936, two years after Oppenheimer sold out to Fein and Williams who, with Sommers' wife, then held all the shares in equal proportions. By 1940 the company had acquired a surplus which was capitalized in newly issued shares, that also were distributed in the same proportion. By 1942 the salaries of Sommers, Fein and Williams had each risen to $9,000; but so far as appears the company had never declared a dividend except the stock dividend of 1940. In 1942 Sommers, Fein and Williams were advised that it would save taxes to dissolve the corporation and form a partnership; but, as Fein and Williams were unwilling to accept Mrs. Sommers as a partner, she was

obliged to transfer her shares to Sommers; which she did in August, 1943, when he and Fein and Williams formed a firm under which they carried on the business during 1944, the year in question.

The judge found that, when Mrs. Sommers bought her shares in the corporation in 1932, the spouses had agreed "that any earnings received on the investment would be shared by them equally." Sommers' testimony was, at least literally, in accord: "She was to be equal, fifty-fifty, on the earnings"; but his wife's testimony seems to be that they were to share whatever he got from the business. However, her memory was indefinite and she apparently had no clear understanding that there might be a difference between "earnings received on the investment" and Sommers' salary. Assuming nevertheless that she did mean that his salary was included the judge was justified in his finding as to the scope of the original agreement, as well as in his later finding that the later agreement of 1943 "was nothing more than a continuation of the understanding of 1932 respecting the stock." In addition to the absence of any written contract and to the unconvincing quality of the testimony, the finding as to the 1932 agreement is confirmed because throughout the years, 1932–1943, both inclusive, Mrs. Sommers filed no income tax return and Sommers filed an annual return including his salary. It is true that—especially in the later part of that period—she had received very substantial sums from her husband; but her failure to return these as income was readily understandable, if they were gifts, or contributions for the joint benefit of the family. On the other hand, if they were paid her in performance of the agreement of 1932, they were income which she and not Sommers should have returned. No satisfactory explanation of this was given; and we should bear in mind that always "transactions between husband and wife calculated to reduce family taxes should always be subjected to special scrutiny." Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 291, 66 S.Ct. 532, 537, 90 L.Ed. 670. In the light of all these facts we should not be warranted in holding that the judge's finding as to the original agreement was "clearly erroneous."

Thus we start with the datum that until the firm was formed in 1943 the spouses had had no understanding that they should divide Sommers' salary, but that the division was limited to "earnings received on the investment." The issue is therefore narrowed to whether the other finding was "clearly erroneous": i. e., that the agreement of 1943 was no more than a carry over of the agreement of 1932. A number of reasons conspire to support that conclusion. In the first place, when the corporation was dissolved and the firm substituted, it was to reduce the corporate taxes, and that did not require any sharing arrangement between the spouses to be changed. Although Mrs. Sommers had to sell her shares, that, as we have said, was only because Fein and Williams did not want her as a partner. She herself repeatedly declared that the old agreement continued; and although Sommers did not explicitly confirm this, he did not suggest that there had been any change. Moreover, he returned as income his whole distributive share earned in five months of that year during which the firm had been in existence. In any event impressive evidence emerges from an analysis of the returns for 1944, which both spouses filed on March 3, 1945. From these it is reasonably clear that in 1945 for the first time they thought that the husband's distributive share was to be divided. Each return disclosed an income of about $11,500—half of Sommers' distributive share in the firm—upon which each computed a tax of about $3,000, and from which each claimed a deduction for payments during 1944, as installments of an "estimated tax." Sommers deducted $6,000, and asserted a claim for an overpayment of about $3,000; his wife deducted $4,100 and had a similar claim for about $750. In the first place it is clear that, when Mrs. Sommers' return was first prepared, it contained no claim for any deduction whatever; the full tax was carried down into the lower column, where it is plainly still visible, in spite of an attempt to erase it. On the face of it the credit to her of $4,100 for payments made in 1944

was an afterthought. That might of course have been an error in the course of preparation; but, even though we treat it as such, the returns, taken at their face, are inconsistent with an agreement in 1944 that Sommers' share should be divided.

During that year there had been paid an "Estimated Tax" of over $10,000; and if, as is usually the case, whoever paid it was paying it in quarters, he must have "estimated" the whole tax liability at over $13,000. To put it most favorably, such an estimate was a very strange miscalculation, if there was an agreement dividing Sommers' share between himself and his wife. In that event each would have had in prospect a tax of over $6,000, which presupposed that each would have a taxable income in the neighborhood of $18,000, and that in turn presupposed that Sommers' distributive share would be $35,000 or $36,000. It is incredible that he should have set his hopes so high, especially as the year wore on. We do not forget that he certainly did set them somewhat too high in any event, for apparently he contemplated paying a tax of $13,000, which presupposed an income of about $28,000; but that was a miscalculation which he might easily have made, particularly as he may have hoped the fourth installment might be somewhat smaller than the earlier ones. His explanation of how he came so largely to miscalculate his share in the business was most unsatisfactory; besides saying that he expected business to be better, the only explanation he gave was that he had relied upon his accountant, whom he could not possibly have expected to prophesy what the firm would earn. If it be answered that Mrs. Sommers would not have paid $4,100 as an "estimated tax" upon an income which she did not share, we reply that there is no evidence outside the return itself that she ever made any payments. Neither she nor Sommers so testified, or produced any cheques to show that she had. Besides, the tinkering of her return, which we have already discussed, lends color to the inference that she never made any payments; and that enough of Sommers' own payments were credited to her to wipe out her tax and leave her a claim to a small surplus. (Incidentally, the distribution of the payments in the proportion of two to three was in any event unexpected, if the income was divided into halves.) For all these reasons we hold that the judge's second finding was not "clearly erroneous" that there was no agreement in 1944 to divide Sommers' share in the firm profits.

Sommers made no effort to isolate from his distributive share any part which might represent "earnings received on the investment." Perhaps he could not; and in any event he makes no such claim now. On the other hand he does make two alternative claims. The first is that a payment of one half his income was a necessary and usual expense of the business under § 23(a) (1) of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1), or an expense incurred in the production of income under § 23(a) (2). There is not justification for either position. The wife's only share in the production of the business or its expenses, was because of the transfer of her shares in the corporation. We will assume arguendo that she might enforce any promise of Sommers which she got as a consideration for that transfer, but such a claim would not fall within § 23(a) (1) or (a) (2). If Sommers is to avail himself of his liability, he can do so only under the terms of the agreement, which is the same question we have already considered. The second alternative has even less to recommend it. As we understand it, that one half of Sommers' distributive share in 1944 is to be taken as interest upon the value of the corporate shares transferred in 1943, the transfer being treated as a loan. The shares were of course not to be returned, for the corporation was to be dissolved; if Sommers was to repay anything, it would be his one third share in the firm; and there is not a whisper of justification for imputing any such understanding to the spouses. Besides, to argue that one half of Sommers' annual distributive share would be "fair" interest upon the loan of the corporate shares, if there had been a loan, has only the merit of the hardihood necessary to affirm it.

Order affirmed.